Filed 5/13/22

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| SALLY KIM et al.,<br><br>    Cross-complainants, Cross-defendants and Respondents,<br><br>v.<br><br>TWA CONSTRUCTION, INC.,<br><br>    Cross-defendant, Cross-complainant and Appellant;<br><br>KEITH TAI WONG,<br><br>    Appellant. | H045900<br>(Santa Clara County<br> Super. Ct. No. 16CV300709) |


This appeal involves a dispute between a married couple (respondents Sally Kim and Dai Truong, collectively respondents) and their former general contractor, appellant TWA Construction, Inc. (TWA) and TWA's owner, appellant Keith Tai Wong (Wong), whom they hired to construct a home on a wooded lot.[1] During the early stages of the

---

[1] Although Wong was not a named party in the trial court proceedings below, this court granted TWA's request to add him as an appellant. This court granted TWA's motion to substitute Wong as the appellant in the appeal of the judgment entered in favor of Truong and Kim on their cross-complaint against TWA. TWA remained the appellant in the appeal of the judgment entered in favor of Kim on TWA's cross-complaint against Kim. We discuss TWA's claim in section II.A., *post* and Wong's claims in sections II.B.–D., *post*.

construction project, a subcontractor hired by Wong for tree trimming services damaged a large eucalyptus tree that was partly owned by Kim and Truong's neighbor.

The neighbor brought suit against Kim and Truong for damage to her property resulting from the work on the eucalyptus tree, which precipitated the litigation that eventually resulted in this appeal.[2] After the neighbor filed suit, Kim and Truong filed a cross-complaint against TWA for comparative negligence, breach of contract, express contractual indemnity, equitable indemnity, and other claims. TWA in turn filed a cross-complaint against Kim and Truong alleging breach of contract and other claims. The complaint and cross-complaints proceeded to trial before a single jury.

During trial, Kim, Truong, and TWA settled the suit with the neighbor, which is not at issue in this appeal. The suits involving respondents' and TWA's cross-complaints continued before the jury. TWA presented no evidence at trial that the subcontractor who worked on the eucalyptus tree was licensed to perform tree trimming work. Relevant to this appeal, the jury returned special verdicts finding TWA was 100 percent at fault for the neighbor's damages and that Kim had paid TWA $10,000 for the tree trimming services performed by TWA's subcontractor. The trial court entered judgment in favor of Kim for $10,000 on Kim's cross-complaint and also in favor of Kim and Truong on their cross-claims against TWA.

On appeal, TWA contends the judgment must be reversed because the trial court erred in its interpretation of the relevant licensing statute, Business and Professions Code section 7031.[3] In addition, Wong asserts the trial court misinterpreted the construction agreement, and substantial evidence does not support the jury finding that Kim paid TWA $10,000 for tree trimming. For the reasons set out below, we affirm the judgment.

---

[2] The neighbor later amended her complaint to add TWA as a defendant.
[3] Unspecified statutory references are to the Business and Professions Code.

2

# I. FACTS AND PROCEDURAL BACKGROUND

A. *Factual Background*[4]

Kim purchased real property located in a wooded area of Los Gatos (property).[5] Kim and Truong planned to build a home and a bridge on the property. As part of the project, they sought to remove some trees, including a large eucalyptus tree (the eucalyptus).[6] The eucalyptus straddled the property line between their property and the property of their neighbor, Joan Todd. Kim and Truong did not at first understand that the eucalyptus was partially on Todd's property and that they needed her permission to remove it. They assumed they could remove the eucalyptus because they had received permits from the county to do so.

In February 2015, Truong and Kim first met with Wong to discuss hiring TWA as the general contractor to build their home. Wong was TWA's owner, an experienced contractor, and served as Kim and Truong's only point of contact with TWA during the events at issue here. TWA held a Class A (general engineering) and Class B (general building) license during all relevant times. Truong recalled showing Wong the eucalyptus in February 2015 and telling him they wanted it removed.

Wong and Kim executed a written construction agreement dated September 28, 2015 (construction agreement).[7] The construction agreement included provisions fixing the contract price at approximately $1.6 million, detailing the scope of work (including site work, bridge work, and the house and retaining walls), stating that all work would be

---

[4] These facts are taken from certain undisputed facts and the evidence presented to the jury. We resolve any conflicts in the evidence—including credibility of witnesses—in favor of the jury's findings. (See *Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925–926.)

[5] Kim took title in the property in her name only.

[6] The eucalyptus tree was approximately 140 to 160 feet tall and had a trunk diameter of approximately six feet. Half the tree sat on Todd's property and half on Kim's property.

[7] Truong was not a signatory to the construction agreement.

performed by licensed individuals, indemnifying Kim from and against, inter alia, claims and damages arising from any negligence of TWA or its employees or subcontractors in performing work under the construction agreement, and addressing attorney and expert fees. Although the parties dispute whether tree removal was encompassed within the construction agreement or addressed in a separate agreement, it is undisputed that Wong agreed as part of the overall project to remove the eucalyptus.

To perform the tree work, Wong hired an individual named Marvin Hoffman, whom Wong did not previously know and had located on the Web site "Craig's List."[8] Wong testified that he had paid Hoffman $400 by check and $16,000 in cash, although he did not have proof of the cash payments. When he hired Hoffman for the project, Wong had not verified Hoffman's licensure status and could not recall whether he asked Hoffman about it. Wong believed Hoffman was a professional tree trimmer because Hoffman had a truck, trailer, and a large saw.

On September 28, 2015, the same day Wong executed the construction agreement, Hoffman began removing the eucalyptus. Wong was present at the site that day but did not assist in the tree work. Before Hoffman and his crew had finished removing the tree, Todd (the neighbor) told Hoffman's workers to stop. Todd also contacted the police. Work on the eucalyptus tree ceased.

Following this incident, Truong and Kim continued for a period of time to use TWA as their general contractor. Ultimately, however, the only work TWA did on the property was related to erosion control (performed by Wong himself) and on the trees (performed by Hoffman).

In April 2016, Truong and Kim terminated the contract with Wong, informing him they could not secure a construction loan using TWA as the contractor. Truong and Kim

---

[8] Hoffman, who apparently could not be located after the litigation started, was not involved in the legal proceedings below, and is not a party in this appeal.

4

eventually hired another contractor to complete the project. Kim paid TWA $16,000 for its work on the project.

B. *Procedural Background*

In October 2016, Todd (the neighbor) brought suit against Truong and Kim for negligence, trespass, and other claims related to the work on the eucalyptus tree. Todd later amended her complaint to add TWA as a defendant.

Kim and Truong filed a cross-complaint against TWA for comparative negligence, breach of contract, express contractual indemnity, equitable indemnity, and other claims. Their operative cross-complaint alleged, inter alia, that TWA was required to indemnify them for the amount of any judgment or settlement they might be compelled to pay in the lawsuit with Todd. The cross-complaint included a claim that TWA was expressly required to indemnify Kim under the terms of the written construction agreement.

TWA then filed a cross-complaint against Kim and Truong. TWA's operative cross-complaint alleged breach of contract based on the written construction agreement and sought damages, including lost profits.[9] TWA also asserted an indemnification claim for Todd's lawsuit against TWA.

Prior to trial, Kim and Truong filed a motion in limine addressing the licensure status of Hoffman, the tree subcontractor. Kim and Truong requested that the trial court require TWA to make an offer of proof as to Hoffman's licensure status. Kim and Truong argued that TWA had chosen to hire an unlicensed contractor to remove the eucalyptus, even though the state contractor's license board required a specialty tree service license for that type of tree work (a "C-61/D-49 Tree Service Specialty license"). They asserted that, pursuant to section 7031, TWA had the burden of establishing proper licensure for the person it had hired for the tree work. The motion asserted that unless

---

[9] TWA claimed at trial, inter alia, that Kim had failed to comply with the contract's termination provision and that she owed TWA $600,000 in lost profits. The jury rejected those claims, and they are not at issue in this appeal.

5

TWA could prove the subcontractor it hired for the tree work had the requisite license, TWA was barred from recovering from Kim and Truong any money paid or owed to the unlicensed subcontractor. Kim and Truong contended TWA had the burden of proving the subcontractor's licensure status with a verified certificate from the Contractors' State License Board. TWA opposed the motion.

The trial court heard argument on the motion in limine. Kim and Truong reiterated that they sought an offer of proof from TWA as to whether Hoffman had a valid contractor's license. Kim and Truong clarified that the issue of licensure was related to their breach of contract cross-claim against TWA in that they contended that TWA should disgorge the $10,000 they had paid for tree work since it had been performed by an unlicensed subcontractor. TWA's counsel asserted that the issue also pertained to TWA's breach of contract claim against Kim because TWA was entitled to recover payment for all its work performed on the project. The trial court inquired of TWA's counsel whether Hoffman was employed by TWA. TWA responded that it did not contend that Hoffman was a TWA employee. TWA did not suggest it had any evidence that Hoffman had been licensed or make any offer of proof on the subject.

The trial court granted Kim and Truong's motion. It found that section 7031 applied here where "suing general contractor seeks compensation for services of a purported unlicensed subcontractor under a subcontract between the general and subcontractor." The trial court ruled that section 7031 barred TWA from "collecting compensation for services performed by the subcontractor for the tree trimming if, in fact, the subcontractor was unlicensed at the relevant time." The ruling in effect allowed Kim and Truong to claim the money paid for the unlicensed contractor should be disgorged and disallowed TWA from presenting a claim for money owed for the tree removal work performed by an unlicensed subcontractor. The ruling did not explicitly bar any party from bringing evidence at trial as to whether Hoffman was licensed.

6

The jury trial occurred in two phases and lasted eight days. Phase 1 addressed Todd's suit against Kim, Truong, and TWA for damage to the trees on her property. Todd called as witnesses Kim and an expert, who was a certified arborist. The arborist generally testified that the tree removal work that had been done on the eucalyptus was unprofessional and fell below the standard of care.

On the fifth day of the jury trial, Kim and Truong reached a settlement with Todd. The settlement provided that Kim and Truong would pay Todd $50,000 and that Kim and Truong could take down the eucalyptus tree. Todd also settled with TWA. She dismissed her complaint with prejudice against TWA in exchange for TWA's promise to waive any claim for costs against her.

Phase 2 of the jury trial addressed the claims in the cross-complaints. The jury heard testimony from Wong, Kim, and Truong, and one expert witness (Gary Ransone), who testified in support of Kim and Truong's case-in-chief. Ransone, who was a general contractor, opined that it was simple to verify whether a subcontractor is properly licensed and insured by going to the Contractors' State License Board Web site. Ransone estimated the verification process takes approximately two minutes. Wong, Kim, and Truong also testified about Kim and Truong's $16,000 payment to TWA. We discuss that testimony in further detail below.

The trial court admitted numerous documents into evidence, including e-mails and text messages exchanged among Kim, Truong, and Wong, and the written construction agreement.

The trial court gave the jury written instructions and special verdict forms. One of the special verdict forms addressed the payments for unlicensed tree work and was provided to the jury over TWA's objection. It asked whether Kim paid TWA "any monies for the tree trimming work performed by [TWA's] unlicensed subcontractor?" To that question, the jury answered yes. Because it answered yes, the jury was then asked "how much did [Kim] pay [TWA] for the tree trimming work performed by

7

[TWA's] subcontractor, Marvin Hoffman?" The jury answered $10,000. Additionally, the jury returned a special verdict finding that TWA was 100 percent negligent and at fault for the harm to Todd and that her damages were $9,098.

On February 6, 2018, the trial court entered judgments on both phases of the trial. Only the phase 2 judgment (hereafter judgment) is at issue in this appeal. Based upon the jury's verdict that TWA was 100 percent liable for negligence and that Todd's damages were $9,098, the trial court doubled that figure to $18,196, pursuant to statute.[10] The court entered judgment in favor of Truong and Kim in the amount of $18,196 on their cross-claims against TWA based on contributory negligence and indemnity and on Kim's separate cross-claim for express contractual indemnity. The judgment ordered TWA to disgorge the $10,000 paid for the tree trimming work performed by TWA's unlicensed subcontractor.[11] It found in favor of Kim as to TWA's cross-complaint against her for breach of contract.

TWA timely filed a notice of appeal of the February 6, 2018 judgment.

Pursuant to the terms of the construction agreement, the trial court issued a postjudgment order awarding Kim $137,821 in attorney fees and $22,505.16 in expert witness fees. The order also awarded Truong and Kim, as the prevailing parties, $18,273.59 in costs and denied TWA's motion to tax costs.

## II. DISCUSSION

Appellants TWA and Wong collectively raise three claims against the judgment. TWA and Wong (together, appellants)[12] contend the trial court erred as a matter of law in

---

[10] The trial court applied Civil Code section 3346 to double the damages. That statute "provides enhanced damages to plaintiffs suffering 'wrongful injuries' [citation] to timber, trees, or underwood." (*Scholes v. Lambirth Trucking Co.* (2020) 8 Cal.5th 1094, 1099.)

[11] The judgment does not specify the precise cross-claim in the cross-complaint to which the $10,000 payment pertains.

[12] TWA and Wong did not file separate briefs in this appeal, and Wong was not added as an appellant until after TWA filed its opening brief. Our analysis specifies

its pretrial ruling on the application of section 7031. Appellants argue the ruling effectively caused TWA to forfeit its claim for compensation from respondents for the tree work. Further, Wong asserts the written construction agreement does not include tree removal and therefore Kim's claims for indemnity and attorney fees based on that agreement cannot stand. In addition, Wong maintains substantial evidence does not support the jury's finding that Kim paid TWA $10,000 for tree services. Wong also challenges the postjudgment order awarding attorney fees to Kim and acknowledges that this issue rises and falls with his contractual claim. We address each claim in turn.

A. *Pretrial Ruling Related to Business and Professions Code Section 7031*

As described above, the trial court decided that section 7031 applied to the facts here—namely, where a general contractor seeks compensation for services of a purported unlicensed subcontractor under a subcontract between the general and subcontractor. The trial court ruled that the statute barred TWA from "collecting compensation for services performed by the subcontractor for the tree trimming under the subcontract if, in fact, the subcontractor was unlicensed at the relevant time." The trial court's ruling allowed Kim and Truong to present to the jury (as reflected in a special verdict form) that TWA had illegally hired an unlicensed subcontractor to do the tree trimming and let the jury decide the amount Kim paid for that illegal work. The ruling did not bar the introduction of evidence at trial as to whether Hoffman was licensed.

On appeal, appellants primarily argue that this pretrial ruling was error and "[e]ffectively [n]onsuited" their breach of contract claim and prevented them from recovering compensation for tree services.

---

whether the claims are made by one or both appellants, to the extent we can make this determination from the briefing. (See fn. 1, *ante*.)

### 1. Standard of Review

TWA contends that the trial court erred in applying section 7031 as a bar to its claims against Kim and Truong to recover money for work done by Hoffman.[13] This is primarily a question of law which we review de novo. (See *Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 937.) Additionally, as TWA alleges the pretrial ruling amounted to a nonsuit, we also independently review the trial court's evidentiary ruling. (See *City of Livermore v. Baca* (2012) 205 Cal.App.4th 1460, 1473.)

### 2. Section 7031 and General Principles

Section 7031 is part of the Contractors' State License Law (§ 7000 et seq.). It "imposes strict and harsh penalties for a contractor's failure to maintain proper licensure. Among other things, the [Contractors' State License Law] states a general rule that, regardless of the merits of the claim, a contractor may not maintain any action, legal or equitable, to recover compensation for 'the performance of any act or contract' unless he or she was duly licensed 'at all times during the performance of that act or contract.' (§ 7031, subd. (a).)" (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 418 (*MW Erectors*).)

At the time of the trial court's ruling, section 7031, subdivision (a) (hereafter section 7031(a)) stated in pertinent part that "no person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract where a license is required by this chapter without alleging that he or she was a duly licensed contractor at all times during the performance of that act or contract, regardless of the merits of the cause of action brought by the

---

[13] TWA's argument appears to relate to TWA's "breach of contract" claim which it asserted against both Kim and Truong.

person."[14] (Former § 7031(a).) If licensure is controverted, the plaintiff must prove, by producing a verified certificate of licensure from the Contractors' State License Board, that it held all necessary licenses during performance of the work. (§ 7031, subd. (d).)

More generally, "[t]he purpose of the licensing law is to protect the public from incompetence and dishonesty in those who provide building and construction services. [Citation.] The licensing requirements provide minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable local laws and codes, and know the rudiments of administering a contracting business. [Citations.] [¶] Section 7031 advances this purpose by withholding judicial aid from those who seek compensation for unlicensed contract work. The obvious statutory intent is to discourage persons who have failed to comply with the licensing law from offering or providing their unlicensed services for pay." (*Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 995 (*Hydrotech*); see also *Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141, 151 (*Lewis & Queen*) [explaining that § 7031(a) "represents a legislative determination that the importance of deterring unlicensed persons from engaging in the contracting business outweighs any harshness between the parties"].)

Subcontractors are governed by the licensing law. (§ 7026.) "Both owners and general contractors are entitled to protection against illegal subcontract work by unlicensed persons. Hence, an unlicensed subcontractor may not recover compensation for his work from either the owner or the general contractor." (*Hydrotech*, *supra*, 52 Cal.3d at p. 997.) In one older appellate decision that construed the predecessor to section 7031(a), the court found the provision to apply "to a subcontractor as well as to a contractor" seeking relief, and the court held that the "contract between the plaintiff and his subcontractor, who was not licensed as required by law, was illegal and void," so the

_____

[14] The current version of section 7031(a) is not materially different (but changes "he or she was" to "they were").

11

general contractor was barred from seeking disgorgement based on a void contract. (*Holm v. Bramwell* (1937) 20 Cal.App.2d 332, 335.)

The California Supreme Court has not directly addressed the factual situation presented here as applied to section 7031(a), where a licensed general contractor seeks compensation from an owner for work performed by an unlicensed subcontractor.[15]

Our higher court, however, has explained the rationale of that statute in broad terms and detailed the policy for its application. Thus, section 7031 bars all actions, regardless of the equities and however they are characterized, which effectively seek "compensation" for illegal unlicensed contract work. (*Hydrotech*, *supra*, 52 Cal.3d at p. 997.) Thus, if the primary "relief sought is compensation" for the unlicensed work, then "section 7031 bars the action." (*Id.* at p. 1002.) "[C]ourts may not resort to equitable considerations in defiance of section 7031." (*Lewis & Queen*, *supra*, 48 Cal.2d at p. 152.)

With these principles in mind, we turn to the application of section 7031 to the facts and circumstances here.

### 3. Analysis

At the outset, we recognize that TWA does not explicitly concede in this court that Hoffman was unlicensed. TWA notes there was no evidence presented at trial that Hoffman was unlicensed at the time he performed the tree work and asserts it would be "erroneous to assume that Hoffman was, in fact, unlicensed." However, TWA provides no authority for that assertion of error.

---

[15] In *MW Erectors*, the California Supreme Court addressed a different legal question; however, a footnote in that decision states "while the statutory scheme contemplates that nonlicensure must be raised as a defense, no statutory provision explicitly requires a duly licensed contractor who is suing for money attributable to the work of *another entity* to affirmatively allege that the other entity was *duly licensed*." (*MW Erectors*, *supra*, 36 Cal.4th at p. 424, fn. 5.)

Having carefully reviewed the record, we decide there is no basis to reasonably infer from the trial evidence that Hoffman was licensed for the tree work. (Cf. *Kinda v. Carpenter* (2016) 247 Cal.App.4th 1268, 1286 ["The Evidence Code defines an inference as 'a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.' (Evid. Code, § 600[, subd. (b)."].) The trial court's ruling did not preclude TWA from proffering such evidence at trial on that question, for example by offering into evidence any licensing board certificates. Nor does TWA contend the tree work at issue on the eucalyptus did not require a specialized license. Since the licensure status of Hoffman was at issue in the trial, and TWA had the opportunity to but did not offer any evidence that Hoffman had the requisite license, there is no basis from which to infer that Hoffman was licensed for the tree work he performed at the property. We therefore assume for purposes of our independent analysis of the applicability of section 7031 that Hoffman was unlicensed in September 2015 when he performed the tree work on the eucalyptus.[16]

We turn now to whether the trial court erred in deciding that section 7031 barred TWA from seeking recovery from Kim and Truong for the value of Hoffman's work. The resolution of this question hinges on the applicability of section 7031 to TWA's claim. The interpretation of a statute presents a question of law, which we review de novo. (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332 (*Goodman*).)

A court's primary goal in construing a statute "is to determine and give effect to the underlying purpose of the law." (*Goodman*, *supra*, 47 Cal.4th at p. 1332.) In so doing, "our first task is to look to the language of the statute itself. [Citation.] When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms." (*DuBois v. Workers' Comp.*

---

[16] While arguing we must infer all evidence in his favor as to the relevant facts, in addressing the legal scope of section 7031, Wong also assumes "arguendo" that Hoffman is unlicensed.

*Appeals Bd.* (1993) 5 Cal.4th 382, 387–388 (*DuBois*).) Thus, " ' "[i]f the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history." ' [Citation.] In other words, we are not free to 'give words an effect different from the plain and direct import of the terms used.' " (*Goodman*, at p. 1332.)

Additionally, we must consider the meaning of the statutory section in the context of the entire statute and the statutory scheme of which it is a part. (*DuBois*, *supra*, 5 Cal.4th at p. 388.) "The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (*Dyna-Med*, *Inc*. *v*. *Fair Employment & Housing Com*. (1987) 43 Cal.3d 1379, 1387 (*Dyna-Med*).) "Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation." (*Ibid.*)

Beginning with the words of the statute, we observe that while the plain meaning of section 7031 is unambiguous, its application to the factual scenario at hand is not immediately clear. Section 7031(a) states, with exceptions not relevant here, that "no person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract where a license is required by this chapter without alleging that they were a duly licensed contractor at all times during the performance of that act or contract regardless of the merits of the cause of action brought by the person."[17] (§ 7031(a).) The statute authorizes a person who uses the services of an unlicensed contractor to "bring an action in any court of competent jurisdiction in this state to recover all compensation paid to the unlicensed

---

[17] For ease of reference, and because the current and former versions of the statute are not materially different, we cite the current version of section 7031. (See fn. 14, *ante*.)

contractor for performance of any act or contract." (*Id.*, subd. (b).) It provides that when the issue of licensure is controverted, the burden of proof falls on the licensee. (*Id.*, subd. (d).)

The plain meaning of the subdivision (a) provision in section 7031, as construed by our Supreme Court, is "that, except as expressly otherwise provided, a contractor may not sue to collect compensation for performance of 'any act or contract' requiring a license without alleging that he or she was duly licensed 'at all times during the performance of that act or contract.' (§ 7031(a).)" (*MW Erectors*, *supra*, 36 Cal.4th at p. 425; see also *Hydrotech*, *supra*, 52 Cal.3d at pp. 991–992.) Its purpose, understood in the broader context of the Contractors' State License Law, is to provide some assurance that persons offering contractor services in California meet baseline qualifications and discourage noncompliance with the licensing law. (*Id.* at p. 995.)

Important to our analysis here, "[s]ection 7031 advances this purpose by withholding judicial aid from those who seek compensation for unlicensed contract work." (*Hydrotech*, *supra*, 52 Cal.3d at p. 995.) It reflects "a legislative determination" as to "the importance of deterring unlicensed persons from engaging in the contracting business . . . by denying violators the right to maintain any action for compensation in the courts of the state." (*Lewis & Queen*, *supra*, 48 Cal.2d at p. 151.)

In short, the plain and unambiguous meaning of section 7031(a) is that it bars a contractor in California from bringing an action for compensation for the unlicensed performance of an act or contract where a license is required. The Supreme Court has construed section 7031(a) as imposing a complete bar to any recovery of compensation for unlicensed work "by specifying that a contractor is barred from all recovery for such an 'act or contract' if unlicensed at any time while performing it." (*MW Erectors*, *supra*, 36 Cal.4th at p. 426, italics omitted.) But whether that bar extends to a licensed

15

contractor for his use of an unlicensed subcontractor is not immediately apparent from the text of section 7031(a) alone.[18]

To clarify the intended scope of section 7031(a), we consider the term " '[c]ontractor' " as defined in the statutory scheme. The statute states that " '[c]ontractor' " includes both "subcontractor and specialty contractor." (§ 7026.) It specifies that a person is a " '[c]ontractor' " within the meaning of the statute regardless of whether that person does the work "himself or herself or by or through others." (*Ibid.*) Thus, the bar imposed by section 7031(a) applies broadly to those in contractor roles. Taken together, sections 7026 and 7031(a) subject subcontractors to the same rules as contractors, prohibiting a subcontractor from taking legal action to recover compensation from the owner or general contractor for unlicensed work performed by the subcontractor. (§§ 7026, 7031(a); see *Hydrotech*, *supra*, 52 Cal.3d at p. 997.)

Scrutinizing the plain language of these provisions more closely, it is at least arguably ambiguous whether section 7031(a) is limited to the scenario in which the entity (or person) who seeks to "bring or maintain [the] action" for compensation and the entity that has "perform[ed] [the] act or contract where a license is required" are strictly the same. (§ 7031(a).) If that were the proper reading of the statute, then it would not extend to TWA on these facts because TWA brought the action for breach of contract (and was properly licensed) but neither TWA nor any TWA employee actually performed the tree work. Conversely, section 7031(a) would encompass the facts here if it extends to a person "acting in the capacity of a contractor" (§ 7031(a)) who does the work requiring a license "by or through others" (§ 7026). Only this latter construction attempts to reconcile the technical application of section 7031 with the broad definition of contractor supplied by section 7026.

---

[18] The parties have not identified on-point authority that addresses this or a similar factual scenario. Nor has this court's independent research uncovered any such cases.

16

To resolve the ambiguity, we look to other provisions of the statute and the statutory scheme of which it is a part, seeking to harmonize the sections with each other and internally. (*DuBois*, *supra*, 5 Cal.4th at p. 388; *Dyna-Med*, *supra*, 43 Cal.3d at p. 1387.) We conclude that to narrowly construe section 7031(a) to allow TWA's claim for compensation to proceed under the circumstances here (thus reversing the trial court's order) would undermine certain other provisions of the statutory scheme governing contractor licensing and contravene the policy behind the statute.

Section 7031 "has as its purpose the enforcement of the Contractors License Law." (*Asdourian v. Araj* (1985) 38 Cal.3d 276, 282, (*Asdourian*), superseded by statute on another ground as stated in *Construction Financial v. Perlite Plastering Co.* (1997) 53 Cal.App.4th 170, 175.) As noted, *ante*, it both bars recovery in a court of law for any contractor or subcontractor who performed the act or contract unlicensed (§ 7031(a)) and authorizes a person who utilizes the services of an unlicensed contractor or subcontractor to bring a court action to recover the compensation paid for that unlicensed work (§ 7031, subd. (b).) These parallel methods of statutory deterrence are referred to, respectively, as the " 'shield' " and " 'sword' " of the Contractors' State License Law. (*Loranger v. Jones* (2010) 184 Cal.App.4th 847, 854.) Subdivisions (a) and (b) of section 7031 thus represent two ways in which the Contractors' State License Law reinforces licensing requirements and penalizes violations.

Other provisions of the statutory framework further incentivize contractors to comply with licensing rules. For example, a licensed contractor who enters into a contract with an unlicensed contractor is subject to discipline by the Contractors' State License Board. (§ 7118; see *Wang v. Division of Labor Standards Enforcement* (1990) 219 Cal.App.3d 1152, 1158.) And the penalty for failure to comply with other rules, specifically regarding employee workers' compensation insurance coverage, is automatic suspension by operation of law of the contractor's license (§ 7125.2), rendering the unlicensed contractor subject to the section 7031 bar for purposes of bringing an action

17

for compensation.  (See *Smith v. Workers' Comp. Appeals Bd.* (2002) 96 Cal.App.4th 117, 127 [noting the Legislature has "harnessed the licensing requirements . . . to serve the statutory goals of the workers' compensation system".])

This comprehensive statutory framework has as its purpose the "protect[ion of] the public" by imposing "strict and harsh penalties for a contractor's failure to maintain proper licensure." (*MW Erectors*, *supra*, 36 Cal.4th at p. 418.)  Against this backdrop, we agree with the trial court's observation that it would be unreasonable to permit TWA to collect compensation for work performed by an unlicensed subcontractor when all facets of the Contractors' State License Law are directed at ensuring licensing compliance.

The essence of TWA's overarching claim, as we understand it, is that Hoffman's licensure status was legally irrelevant because it is undisputed that TWA was itself licensed to perform the task in question.  However, from the precedent set forth above, California law contains a strong policy barring actions that effectively seek compensation for unlicensed work.  Section 7031 accomplishes this policy purpose "by denying a contractor 'access to the courts to recover for the fruits of his labor . . . when he violates the statute.' " (*Asdourian*, *supra*, 38 Cal.3d at p. 282.)

Furthermore, it is clear that an unlicensed subcontractor may not recover compensation for his work from either the owner or the general contractor.  (*Hydrotech*, *supra*, 52 Cal.3d at p. 997.)  To nevertheless enable a contractor to recover compensation for the performance of unlicensed work, simply because the work was accomplished by hiring a subcontractor, would circumvent the purpose of section 7031 and render meaningless the section 7031 bar and expansive definition of contractor to include work performed "by or through others" (§ 7026).  It also would undermine other enforcement mechanisms (i.e., § 7118).  We decline to adopt a statutory construction that would produce such a result that is inconsistent with the overarching statutory scheme.  (See

18

*Dyna-Med*, *supra*, 43 Cal.3d at p. 1387; see also *Flannery v. Prentice* (2001) 26 Cal.4th 572, 578.)

TWA advances several "public policy" arguments for the proposition that section 7031 should not apply to the circumstances at issue. In our view, none of these arguments are legally or factually relevant.

TWA maintains the evidence reflects Hoffman was a "more competent tree cutter" than Wong and that, relatedly, " 'licensed' is not the same as 'competent.' " TWA does not explain the legal relevance of this distinction. It argues that a rule "requiring general contractors to use only licensed subcontractors does not effectively serve" the policy of protecting the public from unskilled or shoddy workmanship.

We note that the application of section 7031 does not require general contractors to use only licensed subcontractors; in theory, general contractors remain free to hire unlicensed subcontractors. However, general contractors who use unlicensed subcontractors may not turn to the courts to recover compensation for those services if a dispute arises. (See *MW Erectors*, *supra*, 36 Cal.4th at p. 430, fn. 10.)

Further, the California Supreme Court has rejected a similar rationale proffered by an out-of-state contractor, who was not licensed in California. The out-of-state contractor contended "its unique skills should exempt it from section 7031." The California Supreme Court disagreed, observing "the licensing law achieves its protective purpose by requiring that a contractor's competence and qualifications, however unique, be examined and certified by the expert agency charged with the law's enforcement." (*Hydrotech*, *supra*, 52 Cal.3d at p. 996.) Wong's personal judgment that Hoffman was more competent than he at tree work does not substitute for a similar conclusion by the licensing agency.

TWA argues it could have hired inexperienced employees "and would not have run into any licensing problems." However, that is not what occurred here. On appeal, TWA claims that Hoffman was in fact TWA's employee. Appellants concede that this

19

argument was not raised below and that, in fact, TWA's counsel stated to the trial court, in direct response to its question about whether Hoffman was employed with TWA, that TWA did "not contend that he was employed." Nevertheless, they appear to maintain the issue of Hoffman's employment status was not forfeited because it is a purely legal argument, which we may address in our de novo review. We are not convinced this issue is a purely legal one, as the parties dispute whether Hoffman was, in fact, Wong's employee and argue, at length, the legal implications that flow from that factual question. (See *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767.) By failing to raise it in the trial court, TWA has forfeited any claim that Hoffman was an employee of TWA.

We also reject TWA's argument that there was "an unjust result" as evidenced, for instance, by the jury's finding that TWA was 100 percent negligent. This argument sounds in equity, but our higher court has ruled that, when applicable, section 7031 bars all actions that effectively seek compensation for illegal unlicensed contract work, regardless of the equities. "Because of the strength and clarity of this policy, it is well settled that section 7031 applies despite injustice to the unlicensed contractor. Section 7031 represents a legislative determination that the importance of deterring unlicensed persons from engaging in the contracting business outweighs any harshness between the parties." (*Hydrotech*, *supra*, 52 Cal.3d at p. 995, italics omitted.)

Relatedly, we reject TWA's conclusory assertion of instructional error and error as to the second special verdict. While framed as instructional error, its argument appears to be identical to the legal question of whether the trial court misapplied section 7031. As we have rejected its claim, we are not convinced any instructional error occurred. Moreover, TWA's instructional error claim appears to seek to reweigh the evidence at trial as appellants highlight trial testimony that they claim show Kim and Truong had "some degree of fault" (underlining omitted) for the tree damage.

20

For all of these reasons, we decide that section 7031 bars even a licensed general contractor in California from bringing an action for compensation for an act or contract performed by an unlicensed subcontractor where a license is required. Therefore, TWA has not satisfied its burden of demonstrating error in the trial court's pretrial ruling applying section 7031.

B. *Interpretation of the Construction Agreement*

Wong also seeks reversal of the judgment on the independent ground that the written September 28, 2015, construction agreement does not include tree work and, thus, the express indemnification and attorney fees provisions in that agreement do not apply to this dispute. Wong contends tree removal was plainly outside the scope of work listed in the construction agreement, and he maintains tree work was part of a separate, oral "side agreement" between TWA, Kim and Truong. Respondents counter that tree services were part of the construction agreement.

1. Standard of Review

"When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126.) This is true even when "extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation." (*Id.* at p. 1127.) "When the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction [following a trial] will be upheld if it is supported by substantial evidence." (*Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 8.) Respondents assert there is disputed extrinsic evidence as to whether the tree work was included in this contract so that substantial evidence review applies. However, our review of the trial record discloses no material conflict in admissible evidence relevant to interpreting the construction agreement. The evidence consists mainly of the construction agreement itself and e-mails and other communications among Kim, Truong, and Wong. We therefore independently review the construction agreement.

21

## 2. Legal Principles

The fundamental goal of contractual interpretation is "to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) "[R]ational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties. Such evidence includes testimony as to the 'circumstances surrounding the making of the agreement . . . including the object, nature and subject matter of the writing . . . ' so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.' " (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39–40, fn. & internal citations omitted.)

The rules of contract interpretation are well-settled. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638.) "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this Title." (Civ. Code, § 1639.) "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." (Civ. Code, § 1647.) "If the language in the contract is ambiguous, 'it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' (Civ. Code, § 1649.) This inquiry does not consider the subjective belief of the promisor but, rather, the 'objectively reasonable' expectation of the promisee." (*Linton v. County of Contra Costa* (2019) 31 Cal.App.5th 628, 636.) "If, after this second inquiry, the ambiguity remains, 'the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.' (Civ. Code, § 1654.)" (*Ibid.*)

## 3. Contractual Provisions

The construction agreement states that it consists of that agreement and four exhibits which represented "the entire agreement of both parties and supercede[s] any

22

prior oral or written agreement." The four exhibits are described as: "Cost Breakdown and Payment Schedule" (Exhibit A); "Plan and Specifications" (Exhibit B); "Construction Schedule" (Exhibit C); and "Finishes Schedule" (Exhibit D).[19]

Article 1 of the agreement is titled "Scope of Work" and states in full that "In accordance with all the terms and conditions set forth in this agreement, Contractor agrees to supply all labor and materials necessary to complete the Home which includes the following work: [¶] 1. Site Work to include all grading, erosion control, sanitary system, storm drain system, water system, propane, and utilities [¶] 2. Bridge abutments and fire turnaround walls [¶] 3. House and retaining walls."

The agreement sets forth a fixed price payment of $1,614,000, subject to certain adjustments not relevant to this appeal.

The agreement also sets forth several general conditions and provisions including one related to "Workmanship and Materials" that states, inter alia, that all work "shall be performed by licensed individuals to perform their said work as outlined by law" and one related to subcontracting that gave TWA (i.e., contractor) the right "to subcontract any portion of the work hereunder, and all work performed by Contractors will be subject to all the applicable terms and conditions of this Agreement." Additionally, the agreement contains a provision restating that the agreement and the documents incorporated therein "constitute the entire Agreement between the parties, and supersede all prior or contemporaneous or written agreements, proposal, estimates, bids, representation, discussion and promises."

4. Extrinsic Evidence

Prior to the contract's execution on September 28, 2015, Wong, Truong and/or Kim exchanged various communications. We focus primarily on the communications explicitly discussing tree work.

_____

[19] The agreement that was admitted into evidence at trial did not include the four attachments.

On September 6, 2015, Wong e-mailed Truong with a proposed pricing and payment for the contract titled "Attachment A." (Some capitalization omitted.) The pricing and payment listed in Attachment A contemplated a total price of $1,614,200 for labor and materials and included a payment of $1,000 as deposit, $30,600 for tree removal, and $10,000 for erosion control.

On September 10, 2015, Wong sent an e-mail to both Kim and Truong related to the Attachment A that Wong had previously sent. Kim questioned Wong about the total for the site work. In response to her question, Wong responded to both Kim and Truong that "I use[d] my management fee and profit to pay for grading tree removal and driveway. The total [is] still the same. $1,614,200. I can meet with you to go over contract. Thanks."

On September 15, 2015, Wong e-mailed Kim and Truong asking if it was okay if his "tree guy" started cutting the "tree." (Capitalization omitted.) Truong responded: "As long as you are sure we can do this ahead of the grading permit. Euc [*sic*] trees are not protected so we assume it's ok. The oak trees to be removed per the plans I don't believe we can touch yet?"

Also on September 15, 2015, Truong sent Wong (copying Kim) a version of the construction agreement. Truong stated he took Wong's contract and "cleaned it up" and added various provisions that included a termination clause. His e-mail also addressed the eucalyptus trees stating "Lastly, there is discussion with county about whether we need a permit to cut down the eucalyptus trees. We are almost certain we may not need one since they are unprotected trees and we have a mitigation plan in place as part of the permits submittal. Hope to have confirmation over next day or so." Truong's e-mail contained an attached contract that contains the identical terms to the contract Wong and Kim signed on September 28, 2015.

On September 16, 2015, Truong forwarded to Wong an e-mail from a county employee confirming that the eucalyptus tree that is the subject of this appeal could be

24

removed.  In his e-mail forwarding that communication, Truong wrote:  "Tai, looks like we're OK with euc [*sic*] tree removal.  Go ahead.  To back us up we already included the trees for removal in the latest plans."

### 5. Analysis

We begin with the language of the construction agreement.  " ' "When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is 'reasonably susceptible' to the interpretation urged by the party.  If it is not, the case is over." ' " (*Brown v. Pacifica Foundation, Inc.* (2019) 34 Cal.App.5th 915, 931.)

As set forth above, the agreement's main provisions do not address tree work.  But while the scope-of-work provision does not mention trees explicitly, neither does it exclude tree services work.  We are not convinced that the language of the scope-of-work provision standing alone establishes that appellants' interpretation that there was a "side agreement" for the tree work is the more reasonable one.  To the contrary, supporting the respondents' interpretation that the tree work was included therein, the written agreement contains a provision that states that it is the "entire" agreement of the parties.  The scope of work provision includes "site work" and a reasonable understanding of that phrase includes tree trimming and removal on the project site.

Moreover, we may consider extrinsic evidence in deciding whether a contract's language is " 'reasonably susceptible' to the interpretation urged." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 (*Winet*), quoting *Blumenfeld v. R.H. Macy & Co.* (1979) 92 Cal.App.3d 38, 45.)  Here, relevant extrinsic evidence, as detailed above and discussed further below, showed that it is at least a reasonable interpretation of the construction agreement that the tree work was included in the construction agreement.  We therefore conclude the written agreement is reasonably susceptible to the interpretation advanced by respondents, although it is ambiguous whether it in fact did so.

25

Admissible extrinsic evidence aids us in this "second step" of interpreting the contract to resolve the ambiguity. (*Winet*, *supra*, 4 Cal.App.4th at p. 1165.) Based on our independent review of the agreement and the relevant admissible evidence, we conclude that at the time of contracting Kim and Wong mutually intended that the tree work be included in the construction agreement.

To advance his interpretation of the construction agreement as excluding tree work, Wong appears to rely solely on the scope of work provision quoted above, pointing out that the provision does not specifically list "tree trimming or removal" as part of the scope of work. However, as we have noted, the language itself is ambiguous in this regard insofar as the "scope of work" provision does not purport to be an exhaustive list of the work to be included, and the contract elsewhere does not specifically exclude tree work. We are not convinced by Wong's interpretation that the written agreement on its face did not cover tree work and that therefore the work was covered by a separate side agreement.

Moreover, the construction agreement expressly disavowed any prior side agreements (to the extent any were created) in its language that the agreement and the documents incorporated therein "constitute the entire Agreement between the parties, and supersede all prior or contemporaneous or written agreements, proposal, estimates, bids, representation, discussion and promises." Additionally, as reflected in the extrinsic evidence, there appears to be no dispute that the parties negotiated a price of $30,600 for the tree work and that Wong factored this price into the overall fixed price of approximately $1.6 million for his labor and materials quoted in the construction agreement. The tree work directly related to the construction of the home and bridge, and the parties expressed a mutual understanding that removing the eucalyptus was a necessary initial step in the construction project.

Contemporaneous e-mails involving Wong, Truong, and Kim discussed work on the eucalyptus tree in the context of preparing and finalizing the written construction

agreement, such as the September 15, 2015 e-mail from Truong to Wong attaching a version of the contract and discussing the eucalyptus in the e-mail. Wong himself testified at trial that the tree work and the erosion control was performed under the construction agreement. Considering all of these facts and circumstances, we conclude that the construction agreement included tree removal work.

To support the argument that there was a separate agreement as to tree work, Wong emphasizes on appeal that Wong "thought" or "believed that he had reached an agreement to provide tree services in February 2015," months before the written contract was executed. But a "part[y's] undisclosed intent or understanding is irrelevant to contract interpretation." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956.) Therefore, this argument does not assist Wong.

Wong also claims the construction agreement was prepared by respondents and cites generally to Civil Code section 1654 for the proposition that any ambiguity should be construed against Kim. However, Civil Code section 1654 states: "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." (Civ. Code, § 1654.) This interpretive rule applies only if ambiguity remains after recourse to other rules of construction. Section 1654 "does not stand for the proposition that, in every case where one of the parties to a contract points out a possible ambiguity, the interpretation favored by the nondrafting party will prevail." (*Rainier Credit Co. v. Western Alliance Corp.* (1985) 171 Cal.App.3d 255, 263.) We have concluded that, applying the other rules of contract interpretation, the contract is not ambiguous as to its inclusion of tree work in its scope. Therefore, Civil Code section 1654 is irrelevant.

For these reasons, we conclude that, applying ordinary rules of contract interpretation, the most reasonable interpretation of the written construction agreement is

that it included tree work, including the work on the eucalyptus at the heart of this dispute.  We therefore reject Wong's claim of error on this ground.

C.  *Substantial Evidence of $10,000 Payment for Tree Trimming*

Wong asserts there is no substantial evidence to support the jury's special verdict finding that Kim had paid TWA $10,000 for the tree trimming services performed by Hoffman.  He maintains that Kim paid three checks totaling $16,000, one of which was $10,000 for erosion control, and thus there is no substantial evidence that she paid TWA for tree trimming work, let alone that she paid $10,000.  Respondents counter that appellants forfeited this argument in their briefing in this court because their opening brief fails to provide material facts favorable to the judgment on this evidentiary issue. They further maintain substantial evidence supports the jury's finding.

1.  Standard of Review

"We will reverse a jury's verdict only if it is unsupported by any substantial evidence, meaning to prevail on appeal defendants must show that the evidence was such as would justify a directed verdict in their favor.  [Citation.]  When applying the substantial evidence test, 'we resolve "all conflicts in the evidence and all legitimate and reasonable inferences that may arise therefrom in favor of the jury's findings and the verdict." ' [Citation.]  We do not reweigh the evidence or judge the credibility of witnesses.  [Citation.]  The 'power of the appellate court is limited to a determination of whether there is any substantial evidence, contradicted or uncontradicted, that will support the verdict.' " (*Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236, 251 (*Mathews*).)

2.  Trial Evidence Related to Payment

It is undisputed that Kim paid TWA $16,000.  Kim testified that in her cross-complaint she sought reimbursement of the $10,000 that she attributed to about one-third of the unlicensed tree work (based on the original contract amount for tree removal work

28

of approximately $30,000).  Kim testified that the tree work was incomplete as a "grove" of trees was still there and the eucalyptus tree was also still on the property.

The jury also received into evidence an e-mail dated April 21, 2016 (postfiling of the neighbor's lawsuit), sent by Truong to Wong (and copying Kim) in which Truong summarized the work completed and payments made as of that date.  Breaking down the $16,000 paid, Truong stated:  "We paid in Sept. $1K deposit to start.  Another $5K in Dec when we signed the bridge contract for the title Ins [*sic*] claim.  Then we paid another $10K in Jan."  Truong stated "To make sure we're on the same page, the tree work is 1/3 completed so far (with majority of work to cut big tree and remove.  Also remove existing stumps and cut several more euc [*sic*] trees)."  Truong stated that this amounted to "$10k."  Truong stated the erosion control work was "1/2 complete" and "[t]hat is $5K."  According to Truong's estimate contained in the e-mail, the "total we owe you for work completed to date is $15K."  Truong testified that his understanding of the e-mail was that he valued the work performed for the tree at $10,000.

Wong responded to Truong's e-mail essentially stating that he disagreed with Truong's breakdown of the numbers contained therein.  Wong stated he was paid $10,000 for erosion control.  Regarding the tree work, Wong stated "you paid $6,000 for part of the $30,000 but I cut down 90% of the tree except half of the big one remaining" and he needed a "check for $18,000 for [the] work done."  (Capitalization omitted.)

Wong also testified he was paid $10,000 for erosion control work and he did work on the "creek on both sides" and there was nothing left for him to do other than maintenance.  By contrast, Kim testified that Wong did not complete the erosion control work, and she was never refunded any portion of the $10,000 she had paid.  She also testified that TWA did not perform any work on the bridge, even though she had written a check to TWA for $5,000 for that work and Wong never returned that money.

29

3. <u>Analysis</u>

Turning first to the question of forfeiture, we agree with respondents that appellants' opening brief fails to acknowledge facts favorable to the judgment, including Truong's and Kim's testimony on the subject. An appellant is required to set forth in the appellate brief all material evidence on the point and not merely appellant's own evidence. (*Foreman & Clark Corporation v. Fallon* (1971) 3 Cal.3d 875, 881.) A party "forfeits [] substantial evidence claims by failing to acknowledge evidence favorable to the judgment." (*Duarte Nursery, Inc. v. California Grape Rootstock Improvement Com.* (2015) 239 Cal.App.4th 1000, 1016; see also *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 737–738.) While the opening brief falls short of this standard, we decide Wong's failure to summarize all of the evidence is not so egregious as to warrant forfeiture. (See *Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 391.)

Nevertheless, Wong's substantial evidence claim lacks merit. As set forth above, substantial evidence supports the jury finding that $10,000 paid by Kim was attributable to tree work performed under the construction agreement. On appeal, Wong insists that there is no evidence supporting the jury's finding because Kim's $10,000 check has the words " 'erosion control' " in the "memo" field of the check and "$16,000 minus $10,000 does not equal $10,000." Wong's argument depends on the implicit premise that he had completed all the erosion control work, contrary to Kim's testimony on that point. We may not second guess the jury's factual resolution of this disputed point. We further note that testimony states Wong never started the bridge work for which he was given a check for $5,000, supporting that this payment in fact related to tree work rather than bridge work. Finally, the April 21, 2016, e-mail by Truong clearly attributes $10,000 to the tree work, and Wong does not dispute the authenticity of the e-mail. Thus, substantial evidence supports the jury's finding that Kim paid $10,000 for the tree work that was performed.

D. *Attorney Fees*

The judgment granted Kim her reasonable attorney fees (and expert witness fees) pursuant to the terms of the "subject construction agreement" between Kim and TWA. Postjudgment, the trial court entered an order dated June 12, 2018. Regarding our jurisdiction, we conclude we have jurisdiction over this postjudgment order, notwithstanding that Wong did not file a separate notice of appeal as to that order. (See *Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993, 997 [holding that "when the judgment expressly makes an award of costs and/or fees"]; *id*. at p. 998 [but leaves the amounts for later determination "the notice of appeal [from the judgment] subsumes any later order setting the amounts of the award"].)

Turning to the merits, Wong does not challenge the substance of the trial court's attorney fees order other than to argue that, if we reverse the judgment, then we must also reverse the award of attorney fees. Because we conclude there is no basis to reverse the judgment, we also affirm Kim's legal entitlement to attorney fees as the prevailing party.[20] (See *Mathews*, *supra*, 43 Cal.App.5th at p. 251.)

## III. DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

---

[20] Wong does not challenge as excessive the amount of the fee award.

_____
                                              Danner, J.

WE CONCUR:

_____
Greenwood, P.J.

_____
Grover, J.

**H045900**
*Truong, et al. v. TWA Construction, Inc., et al.*

| Trial Court: | Santa Clara County Superior Court No. 16CV300709 |
|---|---|
| Trial Judge: | Hon. Drew C. Takaichi |
| Counsel for Cross-defendant, Cross-complainant and Appellant and for Appellant: | James J. Der, Jr. |
| Counsel for Cross-complainants, Cross-defendants and Respondents: | Anna DiBenedetto<br>William Lapcevic<br>DiBenedetto Lapcevic & Draa, LLP |

**H045900**
*Truong, et al. v. TWA Construction, Inc., et al.*